UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEANETTA DENISE NAILON,                    Case No. 1:15-cv-200

      Plaintiff,                           Judge Timothy S. Black

vs.

UNIVERSITY OF
CINCINNATI, *et al.*,

      Defendant.

## ORDER RESOLVING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 32)

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 32) and the parties' responsive memoranda (Docs. 34, 35).

## I.      BACKGROUND FACTS

Plaintiff Jeanetta Denise Nailon was a former employee of the University of Cincinnati who alleges that she was wrongfully terminated in September 2013. Nailon is African American. The individual defendants in this case are all employees of the University who Plaintiff alleges were responsible for her unlawful termination. At the time of Plaintiff's termination, Defendant Ken Wolterman was the Bursar, Defendant Debora Jones was the Associate Bursar, and Defendant Karla Gacasan was a Senior Labor Relations Specialist in the University's HR department.

The University hired Plaintiff in 2000 as a collection specialist in its Office of the Bursar. (Doc. 34, at 7). Defendant Jones was the individual who hired Plaintiff. Plaintiff's job consisted of processing and collecting on loans for students whose last

names fell within a certain letter range. (*Id.*). Between 2005 and 2008, Plaintiff was responsible for managing the accounts of students whose last names were within the letter range of S to Z. (Doc. 1, at 3). During that period of time, Plaintiff's son, Frank D. Young, was a student at the University. (*Id.*). Plaintiff managed his account because his last name fell within the letter range assigned to her, but she did not bring this fact to the attention of her superiors. (*Id.*). Plaintiff wrote off several outstanding fees her son owed to the University. (Doc. 23-2. at 72). Plaintiff alleges that, at that time, the University did not have a policy that precluded her from managing her son's account. (Doc. 1 at 3). In 2009, Plaintiff and the other Resolution Analysts switched alphabet groups and she became responsible for managing student accounts for students whose names began within a different letter range. (*Id.*). As a result, one of Plaintiff's co-workers began managing Mr. Young's account. (*Id.*).

Plaintiff maintains that her actions on her son's Bursar account were not in violation of any rules, pointing out that it was not until July 18, 2013, several years after Plaintiff had taken any action with her son's account, that the Office of the Bursar updated its employee manual to include a specifically-enumerated policy prohibiting employees from handling their family members' accounts. (*Id.*). Defendants have stated that this change was merely an explicit listing of a policy that had already been in place, and that the new, explicit rule against providing benefits to family members was implemented specifically due to Plaintiff's prior violations of University policy. (Doc. 27, at 39).

Plaintiff's niece, Ashley Davis, who is African American, also attended the University and lived with Plaintiff for a period of time.  (Doc. 1, at 3).  In February 2013, Ms. Davis applied for a short-term loan with the Bursar's Office.  (Doc. 32, at 16).  At the time of her application, Ashley Davis fell within the alphabet range assigned to Plaintiff, and Ms. Davis's loan application accordingly was brought before Plaintiff. (*Id.*).  Plaintiff processed and approved her niece's loan.  (Doc. 23, at 103).  Plaintiff's approval of the loan was discovered by Defendant Jones in April 2013, and Plaintiff was reprimanded for approving her niece's loan despite Ms. Davis's poor credit.  (Doc. 25, at 70).  Plaintiff did not inform Defendant Jones at the time that she had waived fees on her son's account years earlier.

In late August 2013, Defendant Jones contacted Ashley Davis regarding an outstanding loan amount.  (Doc. 28, at 27).  Jones threatened Ms. Davis with withdrawal from her classes if she did not pay $4,000.00 in alleged loan amounts due by September 4, 2013.  (*Id.* at 28).  Jones withdrew Davis from her classes before the September 4 deadline.  (Doc. 28-2, at 6).

In response to the withdrawal, Ashley Davis complained of racial discrimination by Jones to several University department heads.  (*Id.* at 5–6).  Davis also expressed her intent to contact the NAACP regarding racially discriminatory student loan account management practices she had experienced with the Bursar's Office.  (*Id.*).  On or about September 5, 2013, Vice President of Student Affairs Debra Merchant re-enrolled Davis in her classes following her complaints of race discrimination.  (*See* Doc. 27, at 71).

On September 10, 2013, Defendant Jones initiated an investigation into Plaintiff's management of her son's loan account from 2005–2008. (Doc. 25, at 85–86). The parties dispute whether this investigation was at all motivated by Ashley Davis's complaint. Defendant Jones involved both Defendant Wolterman and Defendant Gacasan in her investigation into Plaintiff's handling of her son's account. (*Id.* at 90, 109). Defendants did not inform Plaintiff of the investigation until the decision had been made to terminate Plaintiff.

Plaintiff was terminated from her position on September 30, 2013. (Doc. 23-2, at 72–73). Defendants provided Plaintiff with a notice of termination explaining the alleged reasons she was terminated. (*Id.*). The notice stated that Plaintiff had violated the University's conduct policy, and specifically listed several transactions Plaintiff had performed on her son's account reducing or eliminating outstanding fees. (*Id.*). At the time she was terminated, Plaintiff was the only African American working in the Bursar's Office and she was subsequently replaced by a Caucasian employee. (Doc. 1 at 5; Doc. 25, at 106). Plaintiff alleges that she was not given an opportunity to be advised of the basis for her termination or the violations of policy she was alleged to have committed, nor was she afforded an opportunity to respond to the charges. (Doc. 1, at 4). She further alleges that her attempts to seek redress were met with no response. (*Id.*).

Plaintiff's initial complaint raised five different claims, most of which were resolved by this Court in an Order partially granting Defendants' previously-filed motion for judgment on the pleadings. (Doc. 18). Two claims remain against the three

4

individual Defendants named above — a racial discrimination claim under Title VII and a claim of violation of the First Amendment right to free speech under 42 U.S.C. § 1983.

## II.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## III.    ANALYSIS

### A.    Plaintiff's claim of racial discrimination is without merit.

Plaintiff claims that Defendants' termination of her employment discriminated against her on the basis of race.  A claim alleging racial discrimination in employment is analyzed under the burden of proof-shifting framework articulated by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, the burden is on the plaintiff to first establish a *prima facie* case of discrimination.   Once the

plaintiff has done so, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the disputed employment action. *McDonnell-Douglas Corp.*, 411 U.S. at 802.  If the defendant can satisfy this burden, the burden shifts back to the plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision."  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### 1. Defendants have conceded a prima facie case of racial discrimination.

For the purposes of evaluating this motion, Defendants have conceded that Plaintiff has demonstrated a *prima facie* case of racial discrimination.  (Doc. 32, at 22). Therefore, the Court will move directly to the second portion of the *McConnell-Douglas* burden-shifting analysis.

### 2. Defendants have articulated a legitimate, nondiscriminatory reason for terminating employment.

Defendants have adequately articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.  Defendants allege that Plaintiff was terminated due to her working on her son's collection account, which was allegedly misconduct in violation of University policy and Ohio ethics rules.

The parties dispute whether Plaintiff's working on her son's account was actually in violation of any enumerated policy or law at the time.  Defendants maintain that Plaintiff's taking actions to benefit her son by waiving various fees were a violation of University conduct policy 15.02, which states that it is a violation for any employee to "engage in dishonesty, falsification of records, or other deviations from standard and

acceptable behavior." (Doc. 32, at 12; Doc. 23-2, at 74–75). Plaintiff argues that this policy does not specifically state that it was wrong for her to work on her son's account, and points out that a policy specifically prohibiting that behavior was enacted in May 2013, many years after anyone alleges Plaintiff had worked on her son's account.

However, the lack of a specifically enumerated prohibition on doing something does not necessarily mean that an employee has free reign to do so without fear of repercussions. The Sixth Circuit Court of Appeals has rejected similar arguments in employment cases where employers have terminated an employee for violations of ethics rules even though the employee's conduct was not specifically prohibited. *See, e.g.*, *Adamov v. U.S. Bank Nat'l Ass'n*, 727 F.3d 851 (6th Cir. 2013) (upholding termination of a bank manager who personally loaned money to a bank customer, which the bank considered in violation of their ethics rules).

Additionally, Plaintiff's conduct appears to be in violation of the state of Ohio's ethics rules. Ohio Revised Code Section 102.03(D) specifically provides, "(D) No public official or employee[1] shall use or authorize the use of the authority or influence of office or employment to secure anything of value or the promise or offer of anything of value that is of such a character as to manifest a substantial and improper influence upon the public official or employee with respect to that person's duties." The Ohio Ethics Commission has further expounded on the principle that a family member may not be

---

[1] Employees of the University are public employees as the University is a public agency — a state public institution of higher education. (Doc. 32-2, at 1). *See also* O.R.C. §§ 102.01(B) & (C); *Sims v. Univ. of Cincinnati*, 46 F. Supp. 2d 736, 738 (S.D. Ohio 1999) (Weber, J.) ("The University of Cincinnati is an arm of the State of Ohio.") (citations omitted).

involved as a public employee when the matter at issue will result in a benefit to another family member. In Opinion No. 98-002, the Ohio Ethics Commission examined whether a city council member could participate "in matters pertaining to a proposed commercial development if the development borders residential property that your brother owns and which he has optioned to the developer of the proposed commercial development." 1998 WL 619035, at *1 (May 15, 1998). The Ethics Commission noted, "The Ethics Commission has held that R.C. 102.03(D), in its amended form, prohibits a public official or employee from participating in matters that will benefit parties with whom he has a close family, economic, or business relationship because the relationships may impair the public official's objectivity and independence of judgment." *Id.* at *3. Indeed, a public employee may not use her influence, even informally, to secure anything of value for her son. *Id.* Accordingly, in Opinion No. 98- 002, the Ethics Commission stated that the council member could not discuss or participate in a decision of the city that involved a proposed commercial development that bordered residential property owned by a family member and on which the family member optioned to the developer. *Id.* at *4.

Plaintiff did exactly what O.R.C. § 102.03(D) precludes — she used her position and influence to secure benefits for her son. Accordingly, the University has provided a legitimate, non-discriminatory basis for terminating Plaintiff, and she must therefore produce evidence showing pretext.

### 3. Plaintiff cannot demonstrate that Defendants' articulated reason for her termination is merely a pretext for racial animus.

Once a defendant has articulated a legitimate, non-discriminatory reason for terminating a plaintiff employee, that employee must demonstrate that the reason offered by the defendant is merely pretextual and was not the actual reason employment was terminated in order to prevail on a racial discrimination claim. To demonstrate pretext, Plaintiff is required to show: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that they were insufficient to motivate the employment decision." *Jones*, 504 F. App'x 473, 477 (6th Cir. 2012) (emphasis omitted) (*quoting Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (internal citations omitted)). Additionally, Plaintiff must be able to demonstrate at least some evidence of racial animus to survive summary judgment. "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that the proffered reason was not the true reason for the employment decision <u>and that discriminatory animus was the true motivation driving the employer's determination</u>." *Grace v. USCAR*, 521 F.3d 655, 677–78 (6th Cir. 2008) (emphasis added) (internal citations omitted).

Plaintiff has admitted to working on her son's account and waiving fees he had incurred, so Defendant's stated reason for terminating Plaintiff is factually sound. For the reasons explained in Part III.A.2, *supra*, Plaintiff's conduct also gave Defendants a sufficient reason for terminating her employment. The question that remains is whether the reason offered for Plaintiff's termination actually motivated Defendants' decision. As

the Court will explain in Part III.B.2, *infra*, questions remain about whether Plaintiff was terminated in retaliation for her niece exercising her First Amendment rights. However, the evidence in this case would not allow a reasonable juror to conclude that Plaintiff was terminated as a result of discrimination based on her race.

Plaintiff has provided examples of instances at the office when she felt she was discriminated against by her supervisors. (Doc. 34, at 11–12). However, although these alleged events involved Plaintiff being reprimanded for things such as speaking loudly and questioning other employees, there is no allegation of any behavior that singled out Plaintiff on account of her race or that even mentioned race in any way.[2] Plaintiff's argument is that, as the only African American on staff at the Bursar's Office at the time, the fact that she was treated more harshly than her fellow employees for similar conduct is evidence that the reason she was treated more harshly is because of her race. Other than the fact that Plaintiff was the only African American in the office, however, there are no facts on the record to suggest that the decision makers in this instance were motivated in any way by Plaintiff's race.

In this case, the Court finds it appropriate to apply the "same actor inference" to support the conclusion that impermissible racial animus was not a factor in Defendants'

---

[2] The only exception is a comment made by Defendant Wolterman in an email to Defendant Gascan after Plaintiff was terminated, discussing Plaintiff's ongoing complaint with the University. In that email, Wolterman stated that, "[g]iven the way [Plaintiff] has twisted the first meeting when there was only one person present and a claim of racial discrimination, I feel it would be a good idea to have an HR member present who is Afro-American . . . ." (Doc. 24-2, at 15). While this comment, unlike any of Plaintiff's other alleged instances of mistreatment, does specifically refer to Plaintiff's race, the comment was made after Plaintiff was already terminated and does not indicate that Plaintiff's race in any way contributed to the decision to terminate her.

decision to terminate Plaintiff.  The same actor inference holds that "when the same person who hired the plaintiff also fired the plaintiff . . . a presumption can arise that an employee's race did not motivate the termination because the sort of person who would discriminate against a particular race would not also hire someone of that race."  *Garrett v. Southwestern Med. Clinic*, 631 F. App'x 351, 355 (6th Cir. 2015).  The Sixth Circuit allows, but does not require, a court to use the same actor inference to infer that discrimination was not the motivating factor for terminating employment if evidence supporting a finding of discrimination is weak.  *See id.*

Plaintiff was hired by Defendant Jones, Associate Bursar, in 2000.  (Doc. 23, at 34, 68).  Defendant Jones was also the individual who investigated Plaintiff's work on her son's account and brought the alleged misconduct to the attention of Defendant Wolterman, initiating the process of Plaintiff's termination.  (Doc. 27, at 71–72).  The fact that Defendant Jones was inclined to hire an African-American employee weighs against any inference that she sought to have an African-American employee terminated on account of her race.

Plaintiff argues that the same actor inference cannot be appropriately applied at summary judgment as it favors the non-moving party, citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572–73 (6th Cir. 2003) in support.  (Doc. 34, at 17).  However, the Sixth Circuit has held in opinions issued more recently than *Wexler* that District Courts can use the same actor inference at the summary judgment stage.  *See Garrett*, 631 F. App'x 351.  The Court is inclined to do so in this case, as there is not

evidence that would allow a reasonable juror to claim that racial animus was a contributing factor to Plaintiff's termination.

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's Title VII claim of racial discrimination.

**B.     There is sufficient evidence for Plaintiff's 42 U.S.C. § 1983 to survive summary judgment.**

Count III of Plaintiff's Complaint alleges a claim for violation of 42 U.S.C. § 1983 based on the First Amendment. Specifically, Plaintiff alleges that Defendants terminated her in response to her niece's constitutionally protected speech or conduct in violation of her right to free speech on matters of public concern. (Doc. 1, at 6). Defendants maintain that this claim should be dismissed because Plaintiff has not alleged speech that is a matter of public concern.

To prevail on a claim of retaliatory discharge in violation of the First Amendment, a plaintiff must show that: (1) her speech was protected under the First Amendment; (2) she suffered an adverse employment action; and (3) the adverse action was motivated at least in part as a response to the exercise of her constitutional rights. *Savage v. Gee*, 665 F.3d 732, 738 (6th Cir. 2012).  Plaintiff undeniably suffered an adverse employment action, so the second element of that test is not in dispute.

**1.     Ashley Davis's speech was protected under the First Amendment.**

As an initial matter, the Court notes Plaintiff's allegation that her niece — not Plaintiff herself — made the complaints regarding University's discrimination.  For purposes of this motion, however, the Court finds that such allegation is sufficient to

satisfy the first element of a First Amendment retaliation claim. Numerous courts, including the Sixth Circuit, have recognized claims where plaintiffs have alleged First Amendment retaliation after a relative has engaged in protected speech, even though the plaintiffs themselves did not engage in protected speech. *See, e.g., Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x. 534, 542 (6th Cir. 2003); *Fannon v. Patterson*, No. 3:13-cv-14, 2014 WL 4273337, at *4 (S.D. Ohio Aug. 29, 2014); *Ward v. Athens Bd. Of Educ.*, No. 97-5967, 1999 WL 623730 (6th Cir. Aug. 11, 1999); *Dunn v. Butcher*, No. 5:05-cv-355, 2007 WL 2156542, at *3 (E.D. Ky. July 23, 2007).

Defendants argue that Ms. Davis's speech was not constitutionally protected because it did not touch upon a matter of public concern. "The public concern test originated in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), in which the Supreme Court held the First Amendment protects from retaliation government employees who speak on matters of public concern." *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008). The Supreme Court's holding was "expressly limited to government employees and based solely on the need to balance the free speech rights of government employees with the government's needs as an employer." *Id.*

This Court has already rejected Defendants' argument that the public concern test applies in this instance, and does so again here. As previously explained in this Court's Order partially granting Defendants' motion for judgment on the pleadings (Doc. 18), the Sixth Circuit has held that the public concern test does not apply to a citizen criticizing

public officials. *See Jenkins v. Rock Hill Local Sch. Dist*., 513 F.3d 580, 587–88 (6th Cir. 2008) ("Defendants have not pointed to any case from the Supreme Court or this Court that parents criticizing school officials is off-limits when the speech is not about matters of public concern. Rather, the right to criticize public officials is clearly protected by the First Amendment."). Ashley Davis, the individual whose speech allegedly motivated Plaintiff's termination, is a private citizen. The public concern test is therefore inapplicable here.

Furthermore, and again as previously stated by the Court, even if the public concern test were applied to this situation, Ashley Davis's speech was clearly regarding a matter of public concern. Ms. Davis alleged racism and discriminatory treatment on the part of Defendant Jones and the Bursar's Office. (Doc. 28-2, at 5–6). Racial discrimination by public institutions has been held by the U.S. Supreme Court and the Sixth Circuit Court of Appeals to be a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983) ("it is clear that [the plaintiff's] statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern"); *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000) (holding plaintiff's complaint of racial discrimination was "a matter inherently of public concern").

Accordingly, Ashley Davis's complaint was protected speech under the First Amendment.

**2.     There are questions as to whether Plaintiff's termination was in response to her niece's protected speech sufficient for Plaintiff's 1983 claim to survive summary judgment.**

Defendants claim that "it cannot be disputed that the same decision to terminate Plaintiff would have been made even in the absence of Ashley Davis's purported race discrimination complaint." (Doc. 35, at 10). However, after reviewing the relevant evidence, the Court finds that there is a genuine dispute of material fact on this issue, and that summary judgment is therefore not warranted.

The timing of Ashley Davis's complaint and the investigation into Plaintiff's past activity on her son's account is suspect. According to Defendant Wolterman, he and Defendant Jones first heard about Ms. Davis's Complaint on September 3, 2013, the day Ms. Davis first sent an email to various school officials complaining about the conduct of the Bursar's Office. (Doc. 27, at 65, 68). Defendant Jones began her investigation into the work Plaintiff performed on her son's account one week later, on September 10, 2013. (Doc. 25, at 85–86). The Sixth Circuit has held in First Amendment retaliation cases that "direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action[,] may create an inference of causation." *Eckerman v. Tenn. Dep't. of Safety*, 636 F.3d 202, 209 (6th Cir. 2010) (emphasis supplied).

In addition to the suspect timing, circumstances surrounding Ashley Davis's complaints could lead a reasonable juror to conclude that Plaintiff was terminated in retaliation for those complaints. Defendant Wolterman stated in his deposition that, when he first heard of Ms. Davis's complaints, he believed that there was "collusion" between

Plaintiff and Ms. Davis to cast a bad light on the bursar department.  (Doc. 27, at 67).

Wolterman stated to other school officials that he did not want to give leniency to Ms.

Davis by allowing her to enroll in classes without her having paid back the full short-term

loan she received.  (*Id.* at 70).  According to his own deposition, Wolterman was

"overridden" by the University VP for Student Affairs, and Ms. Davis was allowed to

reenroll in classes.  (*Id.*).  Only a few days afterwards, Defendant Jones began her

investigation into Plaintiff's operations on her son's bursar account.  A reasonable juror

could look at this series of events and determine that Defendant Wolterman, who wanted

to prevent Ashley Davis from enrolling in classes but was overruled because of an

allegation that the department he ran had engaged in racial discrimination, retaliated

against the employee whom he believed was conspiring with Ms. Davis to cast a poor

light on the Office of the Bursar.

　　　　Defendants claim that the issues with Plaintiff working on her son's account were

brought to Wolterman's and Jones's attention organically by other employees, and that

the timing was completely coincidental with Ashley Davis's complaint regarding the

Bursar's Office.  This claim is supported by the testimony of Bursar's Office employee

Karen Davis, who claims to have originally discovered the issue with Plaintiff's son's

account and brought it to Defendant Jones's attention of her own volition on September

10, 2013.  (Doc. 26, at 37–40).  Plaintiff calls this explanation implausible and questions

the motives behind the initial review of her son's account, as Karen Davis had been

assigned to Plaintiff's son's account for some time without any mention of an issue.

Defendants claim that Plaintiff's conduct in performing transactions on her son's account serves to demonstrate that Plaintiff would have been terminated even had Ashley Davis not made her racial discrimination complaint.  However, Defendants have not demonstrated this beyond any dispute of material fact.  Defendants admit that Plaintiff has been caught working on a family member's Bursar account in the past and was only reprimanded, not terminated.  (*See* Doc. 23-2, at 99–100).  The conduct for which Plaintiff was reprimanded (working on Ashley Davis's account) occurred several years *after* the conduct for which she was allegedly terminated (several transactions on her son's account).  And while Defendants have alleged several inappropriate actions by Plaintiff beyond simply working on her son's account, such as waiving late fees that did not exist and falsely claiming to place an account with the Attorney General's office for collection (*See* Doc. 23-2, at 72), those facts are disputed by Plaintiff and questions remain about the rules and policies of the Bursar's Office at the time of Plaintiff's termination that represent a genuine dispute of material fact.

Ultimately, the Court finds that there is a genuine issue of material fact as to whether Ashley Davis's complaints of racial discrimination in the Bursar's Office were a complete or partial motivator of the decision to terminate Plaintiff.  Accordingly, Defendants' motion for summary judgment on Plaintiff's 42 U.S.C. § 1983 claim is denied.

### C. A genuine dispute exists over whether Defendant Gacasan was a decision maker in Plaintiff's termination.

A plaintiff seeking to hold an individual liable under Section 1983 must prove the individual directly participated in a constitutional violation. *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (stating that under Section 1983, "a plaintiff must demonstrate that the actor 'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself.") (*citing Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)); *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Defendants argue that Defendant Karla Gacasan, who served as a Senior Labor Relations Specialist in the University of Cincinnati's HR department at the time Plaintiff was terminated, should be dismissed from the civil action because the facts clearly demonstrate that she was not a decision maker in the decision to terminate Plaintiff. (Doc. 32, at 34–35). However, there remains a genuine dispute of material fact over Gacasan's role in Plaintiff's termination. While Gacasan stated at her deposition that the final decision was made by someone within the Bursar's Office, testimony from Defendant Jones seems to suggest that Ms. Gacasan recommended Plaintiff's termination before the decision was made. (Doc. 25, at 60–61). This could be reasonably seen as either "implicitly authorizing" or "approving" the questioned conduct as outlined by *Flagg*.

18

Accordingly, dismissal of Defendant Karla Gacasan is not appropriate at the summary judgment stage.

**D.      The remaining Defendants are not entitled to qualified immunity.**

Government officials sued in their individual capacity are shielded from liability under the doctrine of qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The burden is on Plaintiff to show that the Individual Defendants are not entitled to qualified immunity in relation to her § 1983 claims. *See Miller v. Admin. Office of Courts*, 448 F.3d 887, 894 (6th Cir. 2006).  The qualified immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights.  *See Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id.* (*citing Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The court has discretion to first decide whether there was a constitutional violation at all, or whether clearly established law was violated.  *Id.*

Whether law is "clearly established" is normally determined with reference to the decisions of the Supreme Court or the Sixth Circuit. *See Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (*citing Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993) ("[I]t is only in extraordinary cases that we can look beyond Supreme

Court and Sixth Circuit precedent to find 'clearly established law.'")).  "Although

decisions of other courts can clearly establish the law, such decisions must both point

unmistakably to the unconstitutionality of the conduct and be so clearly foreshadowed by

applicable direct authority as to leave no doubt in the mind of a reasonable officer that his

conduct was unconstitutional." *Mumford v. Zieba*, 4 F.3d 429, 432–33 (6th Cir. 1993)

(*quoting Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir. 1992)).

The fundamental inquiry is whether public officials are "'on notice their conduct is

unlawful.'" *Hope v. Pelzer,* 536 U.S. 730 (2002) (*quoting Saucier v. Katz*, 533 U.S. 194,

206 (2001)). "'[I]n the light of pre-existing law[,] the unlawfulness must be apparent.'"

*Id*. (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To determine that a right

was clearly established, "[t]he contours of the right must be sufficiently clear that a

reasonable official would understand what he is doing violates that right." *Anderson*, 483

U.S. at 640.

In this case, Plaintiff's § 1983 claim is based on an allegation that Defendants'

decision to terminate Plaintiff was a result of Plaintiffs' niece's complaints regarding

racial discrimination in the Bursar's Office.  It should be clear to any reasonable

University official that such a retaliatory termination would be unlawful.   *Zilich v.

Longo*, 34 F.3d 359, 365 (6th Cir. 1994) ("The law is well-settled in this Circuit that

retaliation under color of law for the exercise of First Amendment rights is

unconstitutional and retaliation claims have been asserted in various factual scenarios.");

*Thompson v. Ohio State Univ*., 990 F. Supp. 2d 801, 812 (S.D. Ohio 2014) ("[I]t is

clearly established that a public official's retaliation against an individual for exercising

First Amendment rights violates 42 U.S.C. § 1983."); *Abdulsalaam v. Franklin Cnty. Bd. of Comm'rs* 637 F. Supp.2d 561, 584–85 (S.D. Ohio 2009)) (denying qualified immunity in First Amendment retaliation case; public official should have known that fabricating evidence against plaintiff in retaliation for complaining about a children's services agency investigation violated clearly established First Amendment rights).

Defendants do not argue that a retaliatory termination for the speech of a third party would not be a clear constitutional violation.  However, they do argue that the Defendants are entitled to qualified immunity because of "the baselessness of Plaintiff's First Amendment retaliation claim[.]"  (Doc. 35, at 11).  However, as previously discussed, the Court finds there is a sufficient dispute of material fact to allow Plaintiff's First Amendment retaliation claim to proceed.  Should a jury find that Defendants retaliated as Plaintiff alleges, then Defendants cannot claim that they did not know those actions were unlawful.

Accordingly, Defendants' request that this case be dismissed on the grounds of qualified immunity is denied.

## IV.   CONCLUSION

For these reasons:

(1)    Defendants' motion for summary judgment (Doc. 32) is **GRANTED** as to Plaintiff's Title VII claim of racial discrimination.  That claim is **DISMISSED.**

(2)    Defendants' motion for summary judgment (Doc. 32) is **DENIED** as to Plaintiff's 24 U.S.C. § 1983 First Amendment claim.

(3)    Defendants' motion to dismiss Defendant Karla Gacasan from the case (Doc. 32) is **DENIED.**

**IT IS SO ORDERED**.

Date:  11/7/16                                          *s/ Timothy S. Black*
                                                       Timothy S. Black
                                                       United States District Judge